IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 4, 2024

## KENNETH D. COOK v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Gibson County
Nos. H9849, 19858  Clayburn Peeples, Judge**

_____

### No. W2023-01408-CCA-R3-PC

_____

The Petitioner, Kenneth D. Cook, appeals from the denial of his petition seeking post-conviction relief from his guilty plea convictions of solicitation of first-degree murder, robbery, and aggravated assault with serious bodily injury. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Kelly F. Tomlinson, Brownsville, Tennessee, for the appellant, Kenneth D. Cook.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Frederick H. Agee, District Attorney General; and Scott Kirk, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On June 3, 2019, the day the Petitioner was set to go to trial, he entered guilty pleas in case numbers 19858 (solicitation of first-degree murder) and H-9849 (robbery and aggravated assault with serious bodily injury). Before entering his guilty pleas, the trial court explained that they were conducting the plea colloquy in the judge's chambers instead of the courtroom where the jury was seated in the event they still needed to go forward with the trial. The Petitioner waived jurisdiction in his Humbolt based robbery and aggravated assault case to dispose of it at the same time as the Trenton based solicitation of first-degree murder. The trial court advised the Petitioner of his rights if he chose to proceed to trial, including the right to counsel, the right to remain silent, the right to confront and cross-examine witnesses against him, and the right to call witnesses on his

behalf.  The trial court advised the Petitioner these rights would be waived by entering into the plea agreement.  The trial court further advised the Petitioner that if his guilty pleas were accepted by the court, it would "close the matter forever with regard to your guilt or innocence of the things to which you plead guilty" and that these convictions may be used to enhance his sentence on any later convictions.  The trial court asked the Petitioner if he had any questions, and the Petitioner replied, "No, sir.  I just wanted to make sure that I'm signing for one [thirty]-year sentence at [thirty] percent and not no consecutive of [fifteen] and a [fifteen] consecutive while I'm out to serve a [fifteen] followed by another [fifteen]."

The trial court and the State engaged in a discussion and explained the alignment of the Petitioner's sentence and assured the Petitioner he was receiving a concurrent sentence. The trial court then asked the Petitioner if he had any further questions, and the Petitioner said no.  The trial court then asked the Petitioner if he had enough time to make a decision, and the following lengthy exchange occurred:

> [THE PETITIONER]:  Well, I don't know.  On the hands of everything going on, I said I didn't have no choice.
>
> THE COURT:  All right.  Well, General – I'm going to ask the prosecutor to tell me what happened.  And you do have a choice.  The choice is to go to trial, but I know you don't want to do that.
>
> [THE PETITIONER]:  I'm saying as far as the decision –
>
> THE COURT:  I know.  I understand.
>
> [THE PETITIONER]:  -- of going to trial was sprung on me at the last minute.
>
> [THE STATE]:  All right.  Your Honor –
>
> THE COURT:  Wait.  Wait just a minute.  Let -- before you do that, let's explore what he just said.  He said this is sprung on him at the last minute.
>
> [THE STATE]:  Okay.
>
> [DEFENSE COUNSEL]:  Your Honor, I think last Thursday about eight days ago I got an all-inclusive offer to handle all of his cases from [the State].  I believe it was that -- that evening.

[THE STATE]: At this point, the last Thursday was like twelve days ago because today is Monday.

[DEFENSE COUNSEL]: Oh, you're right. I'm sorry. I got confused. Yes. That's—

[THE STATE]: Four plus seven - eleven days ago.

[DEFENSE COUNSEL]: Right. Last Thursday we got the all-inclusive offer -- this exact offer. Now I had tried -- at that point, [the Petitioner] was housed at Morgan County. And I attempted to contact Morgan County to get up there to go visit him. They never even -- I never got a return call from them, but, however, [the Petitioner] had left Morgan County that next week, I think, at -- on Tuesday.

[THE PETITIONER]: Wednesday.

[DEFENSE COUNSEL]: Okay. On Wednesday. And came back and came to Trenton -- or came to Henning. He went to Henning TDOC and then from Henning went to Gibson County later Wednesday evening. I attempted to contact him. I got some information that he would be here Wednesday -- meaning here -- meaning Gibson County Jail, and he was not there yet.

So the first time I was able to talk to him about this offer was Thursday morning. I talked to him for about four hours on Thursday morning and –

THE COURT: "This offer" being the offer that he ultimately has taken?

[DEFENSE COUNSEL]: That's right.

THE COURT: All right.

[DEFENSE COUNSEL]: That is correct.

[THE STATE]: For the record so it was four days ago you began talking to him?

[DEFENSE COUNSEL]: Correct.

- 3 -

[THE STATE]:  And –

THE COURT:  All right.

[THE STATE]:  -- met with him for four hours that day?

[DEFENSE COUNSEL]:  Yes.

THE COURT: And, of course, you know, the record will show that we were in court here Friday morning and we discussed your situation.

[THE PETITIONER]:  And now really the plea deadline was actually the date that I was told.

[DEFENSE COUNSEL]:  Right.  That's - that is correct.

THE COURT:  This -- that -- I understand that.

[THE STATE]:  Your Honor, that is true.  And for the record, I re-thought the State's position in light of I didn't want [the Petitioner] put on the spot like that.  They did communicate with me Friday afternoon as in three days ago that they wanted to take the offer.  And at that point, I said, you know, "It's too late."  I thought about that over the weekend, and I talked to General Brown.  Even though the offer had been made over a week prior to that, I know that [the Petitioner] didn't get it until Thursday.  So I talked to [defense counsel] yesterday, and I said, "We'll do that [thirty] years."  And I changed my mind and talked to the boss.  He said, "Okay."  He went and met with [the Petitioner], and here we are now doing exactly what the offer was made that was made –

THE COURT:  Well, had there been a previous offer?

[THE STATE]:  -- eleven days ago.  There had been an offer on his old cases prior to this Solicitation of Murder.  But that offer was an all[-]inclusive [twenty]-year sentence.

THE COURT:  For the Humboldt matters?

- 4 -

[THE STATE]: For the – and he's got several other things. I'm dismissing three docket numbers upon his pleas in this. He -- it was a package [twenty][-]year offer. He picked up this new Solicitation and Conspiracy to Commit Murder, and we changed that to a [thirty]-year offer. And he had exposures much, much greater than that.

[DEFENSE COUNSEL]: Right. But initially your offer was [forty] years. It was [twenty] and [twenty] to him?

[THE STATE]: That's correct.

[DEFENSE COUNSEL]: Correct?

THE COURT: Had you conveyed that to him?

[DEFENSE COUNSEL]: Yes.

[THE PETITIONER]: What was the [twenty-five] that you said that you never knew the percentage on that they had offered and I asked you to get back to me about the [twenty-five]? Do you remember the first time we came for this and you said they offered [twenty-five], but you don't know what percentage it was. And you think it was just on the—

THE COURT: Humboldt cases.

[THE PETITIONER]: No. It was supposed to have just been on this case. You said you didn't know for sure what it was.

[DEFENSE COUNSEL]: I don't recall that [twenty-five]-year offer because I know I -- I just recall there was a [twenty]-year offer on this case, and it was a [twenty]-year offer on your Humboldt case, and their offer was to run it consecutive for a sentence of [forty] years.

THE COURT: [Petitioner], do you wish to take this offer?

[THE PETITIONER]: Yes, sir.

Upon hearing that the Petitioner accepted the State's offer, the State provided the factual basis in support of the guilty pleas in the Humboldt case, case number H-9849:

[THE STATE]: -- the proof would show that on January 27, 2016, this [Petitioner] did go to a residence located at 224 West Avenue in Medina; Tennessee, which was the residence of Melissa Smothers. There he did go and brandished a weapon. And there was at least one other person present, that being Diamond Street. And he did take a sum of money from Ms. Smothers, the proof would show, at gunpoint, that this was essentially an Aggravated Robbery, that the amount of cash taken was approximately $13,000. We resolved this as a plea to one count of Simple Robbery and two counts of Aggravated Assault, being the brandishing of a weapon in the presence of the two adults that were there. This is a multi, multi-count indictment. He's pleading to Count 4, Count 10, and Count 12. All other counts will be dismissed.

The trial court asked, and the State confirmed that the Petitioner would receive "a 15[-]year sentence for each" of the above convictions even though the sentence was outside of the Petitioner's range. The trial court also asked, and the State confirmed that the Petitioner's convictions in the Humbolt case would be served concurrently with Case number 19858, the solicitation of first-degree murder. The Petitioner was also required to pay restitution. The factual basis in support of Case number 19858 was as follows:

[I]n Case Number 19858, this [Petitioner] while incarcerated in the Gibson County Jail was awaiting trial on the aforementioned Number H-9849. That trial was set to occur on May 18, 2017, being with the victim, Melissa Smothers, from the H-9849 would have been the State's key witness in the prosecution of that on that trial date of May 18, 2017. Shortly before May 18, 2017, approximately, the proof would show May 6th of 2017, this [Petitioner] while in the county jail awaiting trial did approach Jason Samples who was also an inmate serving a sentence at the jail and did inquire about whether or not he could kill Melissa Smothers in exchange for a payment. Jason Samples had somehow developed a reputation as being some type of a hit man. I think the proof would show that he is not a hit man but that he somehow had that reputation.

Approximately a day after that, Mr. Samples did write letters to Paul Thomas, to Garry Brown telling him - telling them that he'd been approached in the jail. Ultimately[,] we contacted the [Tennessee Bureau of Investigation ("TBI")]. The TBI got with Mr. Samples and gave him a recording device, and he went inside the jail and recorded [the Petitioner] in more than one conversation discussing how he would be paid for carrying out this murder. He was to get out a few days later, and they had made arrangements or they

- 6 -

were going to make arrangements to get Mr. Samples a gun and an amount of illegal drugs in exchange for payment for the murder. Once Mr. Samples got out of jail, he was given a phone number that was: a TBI recorded line number or a TBI number. Mr. Samples had given that number to [the Petitioner] as being his contact information. And after Mr. Samples was out, he awaited contact from someone that was going to provide him a gun and the illegal drugs.

That was all a setup where agents were going to apprehend whoever made the delivery. [The Petitioner] did place several phone calls from the jail to various people including, among others, the co-defendant, Monique Lennon. And the proof would show that it was in an attempt to get this delivery made to Mr. Samples. But ultimately the delivery was never made. The victim was notified because the delivery had never been made of the items, and the arrest had never been made. She was notified of this potential threat to her life. One person told another person, and pretty soon everybody knew, including, I believe, [the Petitioner] in the jail. And that was sort of the end of this sting operation. [The Petitioner] was indicted along with Ms. Lennon on a two-count indictment. He'll be pleading to the Solicitation of First: Degree Murder. That'll be Count 2. Count 1 would be dismissed. He will receive an out-of-range sentence of [thirty] years, being the maximum sentence for a B Felony, but at the less range of [thirty] percent- - . . . . concurrent with the Humbolt case.

The trial court asked the Petitioner, "[I]s that essentially what happened in those cases?" The Petitioner responded, "That's what they've got on paper. Yes, sir." The trial court asked again, "Is that essentially what happened?" And the Petitioner replied, "Yes, sir. That's part of it. Yes, sir." The State noted that the Petitioner's sentences would be served consecutively to an unrelated case for which the Petitioner was serving a four-year term. The trial court then determined that the Petitioner had entered his guilty pleas knowingly and voluntarily with the advice of competent counsel and imposed a sentence consistent with the plea agreement.

The Petitioner timely filed a pro se post-conviction petition alleging numerous grounds for relief, including an allegation that his plea was unlawfully induced or involuntarily entered because "counsel failed to give [the Petitioner] any discovery to help prepare for his case" and "counsel was not truthful about the trial/plea[.]" The Petitioner asserted that "counsel failed to give any evidence found during the discovery process with the State to the [the Petitioner] until the day of trial." The Petitioner acknowledged that counsel "gave a jump drive to the [the Petitioner's] mom at the [Petitioner's] request," but she was unable to access any information from it. Without the State's evidence against the

Petitioner, the Petitioner argued he was not able to prepare his defenses with counsel nor was he able to decide until the day of trial whether he should accept a plea offer. The Petitioner additionally alleged that he was "told to dress" for trial on what he believed to be his trial day in court. However, instead of going into the courtroom on the trial day, the [Petitioner] was directed to the Judge's Chambers for the plea agreement. The Petitioner asserted he was not prepared for what happened in chambers as he had just received discovery from counsel. The post-conviction court subsequently appointed post-conviction counsel, who filed an amendment to the petition, and the State filed a response denying all claims.

As relevant to the issue raised herein, the following proof was adduced at the post-conviction evidentiary hearing on August 2, 2023. Regarding discovery, the Petitioner was aggrieved because counsel "never gave [him] any motion at all." The Petitioner testified that he had been in jail for over two years and had not received any "paperwork" from counsel. The Petitioner said counsel gave the Petitioner's family "a disc which they took several places trying to get the information off of, but nothing was there." On the day set for trial, the Petitioner stated he received "the Motion for Discovery which [counsel] signed a piece of paper to still basically admit that he just now gave me that Motion of Discovery the day that I'm signing the plea." The Petitioner explained he was sitting in the hallway, and counsel went to print off a copy of the discovery and gave it to the Petitioner on the day of his guilty pleas. The Petitioner said he was unable to review his discovery prior to entry of his guilty pleas because he did not have time and he was "rush[ed]." The Petitioner said he did not have time to review any of the evidence or what "[he] could have been going up against" or "if [he] wanted to change [his] mind or anything." The Petitioner believed "it was like . . . a tactic. I didn't . . . I didn't have no choice." The Petitioner said he signed the plea deal when counsel gave him the discovery.

On cross-examination, the Petitioner agreed that he told the court that the facts announced by the State were "essentially" what happened. The Petitioner explained, however, that was only "part of it" because he did not have discovery material to know what he was "up against." Although he knew "what the TBIs came to the jail and approached him about," he insisted he never knew any of the evidence against him. He maintained that he was forced to take a plea deal without knowing any of the evidence against him.

Counsel testified that he visited the Petitioner at least nine times in jail. Counsel filed motions for discovery in all of the Petitioner's cases, and he believed "the problem with getting the [Petitioner] discovery" was the number of cases the Petitioner had. Counsel explained that in the process of getting some of those cases dismissed, the Petitioner was indicted for the solicitation of first-degree murder. All the discovery in that case consisted of recordings and statements the Petitioner made to a jailhouse informant.

Counsel said the Petitioner "has no access to get . . . digital copies of that." However, counsel said he reviewed with the Petitioner all of the discovery, including "paper discovery and everything as far as what the recordings had on them." Counsel recalled that they may have listened to some of the recordings together. Counsel obtained a private investigator and a cell phone expert to assist in the investigation of the case. Counsel vaguely recalled giving the Petitioner's mother a copy of the recordings and that she had difficulty accessing the digital recordings from the compact disc.

Counsel agreed that he gave the Petitioner a packet of paperwork "at the last hour[,]" however, counsel could not recall if it was discovery material. Counsel recalled the day of the guilty plea differently than the Petitioner. Counsel said that on June 3, 2019, the Petitioner was set to go to trial. However, a week prior to that day, the State had contacted counsel and advised him they had until the end of the week to accept the plea agreement. After that date, "all plea deadlines [were] off." On the day counsel received the initial call from the State relaying the plea deadline, a Wednesday, counsel went to meet with the Petitioner, but he was not there. The next day, counsel met with the Petitioner for four hours, explained the final plea offer, and reviewed the Petitioner's "total exposure on all of his cases." This meeting involved a "very heated exchange," and counsel filed a motion to withdraw based on it. However, later that same day, counsel received a call from the Petitioner wanting to accept the State's offer. Counsel contacted the State; however, they told him it was beyond the deadline and refused to accept it. Counsel met with the Petitioner that weekend and explained the situation. The Sunday before the day of trial, counsel was notified by the State that they would allow the Petitioner to plead guilty if he still wanted to do so. Counsel then notified the Petitioner, and the Petitioner said, "That's fine."

The post-conviction court issued an order denying relief on August 31, 2023. The order incorporated the court's findings of fact and conclusions of law from the evidentiary hearing which provided, in relevant part, as follows:

> Okay. Let me deal with [the Petitioner's] accusations, if you will, or positions, one at a time. First of all with regard to ineffective assistance of counsel, I think it's clear from [defense counsel's] testimony today and from the record in this case that he did an extremely effective job of representing [the Petitioner] under very, very difficult circumstances. He -- in twenty years of being a judge and twenty before that of being a District Attorney, I've never heard in a case like this an attorney say he had visited the client in jail at least nine times. Normally the accusation is that "He never came to see me" or "He only came to see me once." And frankly I know from observing [defense counsel] in many, many other cases he does pay personal attention to his clients, and he does visit them even when incarcerated. So I

- 9 -

have no doubt that at least nine times when he testifies to that means at least nine times.

. . . .

With regard to the discovery, again, going to [defense counsel's] testimony, a great, great deal of discovery was obtained in this case. I have not heard any proof of any discovery that was not obtained that would have changed the posture of this case in -- in any way.

. . . .

[The Petitioner] calls this a "surprise plea deal." This -- this was an extended, long-running plea agreement. I find it significant frankly that he's the one who said he wanted the deal. And the District Attorney's Office at first said, "No. We're not going to do it. You've waited too long." The only surprise was that they changed their mind. But they didn't offer him something then that they hadn't already offered. So I -- I just don't find any merit in that at all.

I also frankly after reading the statements in the transcript by the judge don't believe that that influenced him to plead guilty unless, in fact, the information the judge gave him might have influenced him. It always grieves me as a judge when a defendant refuses to plead guilty to something and then is found guilty and gets a sentence of three or four or maybe even five or six times what the plea agreement was. Based upon what I've seen in this case, I think it's probable that the [Petitioner] would have gotten substantially more than thirty years. This lawyer testified that he was facing more than a hundred years as a possibility. And quite frankly, he might have gotten that too. He very possibly if not probably would have received a -- the equivalent of a life sentence had he gone to trial and been found guilty. And the evidence looked like he would, in fact, be found guilty. Now is it prejudicial to a defendant to make sure he knows that? I don't think it is. And so I – I'm finding for all those reasons that the [Petitioner's] motion is not well taken, and -- and it is denied.

The Petitioner filed a timely notice of appeal, and this case is now properly before this court for review.

## ANALYSIS

We begin our analysis by acknowledging the following well-established legal framework. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the

burden of proving the factual allegations by clear and convincing evidence. Id. § 40-30-110(f); see Tenn. Sup. Ct. R. 28, § 8(D)(1); Nesbit v. State, 452 S.W.3d 779, 786 (Tenn. 2014). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

A claim for post-conviction relief based on alleged ineffective assistance of counsel presents a mixed question of law and fact. Mobley v. State, 397 S.W.3d 70, 80 (Tenn. 2013) (citing Calvert v. State, 342 S.W.3d 477, 485 (Tenn. 2011)). A post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Calvert, 342 S.W.3d at 485 (citing Grindstaff, 297 S.W.3d at 216; State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). "Accordingly, we generally defer to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Mobley, 397 S.W.3d at 80 (citing Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999)). "However, we review de novo a post-conviction court's application of the law to its factual findings and accord no presumption of correctness to the court's conclusions of law." Id. (citing Grindstaff, 297 S.W.3d at 216; Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007); Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006)).

The right to effective assistance of counsel is protected by both the United States Constitution and the Tennessee Constitution. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to prevail on an ineffective assistance of counsel claim, a petitioner must establish (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996); Strickland v. Washington, 466 U.S. 668, 687 (1984). A petitioner proves deficient performance if the petitioner proves that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Id. (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). A petitioner proves that a deficiency resulted in prejudice if the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 370 (quoting Strickland, 466 U.S. at 694). However, to establish prejudice in the context of a guilty plea, a petitioner must show that there is a reasonable probability that, but for counsel's errors, the petitioner would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

The Supreme Court clarified this standard in Lee v. United States, 582 U.S. 357 (2017), noting that the inquiry demands "a case-by-case examination of the totality of the evidence." Id. at 358 (internal quotation marks omitted). The Court elaborated:

Surmounting Strickland's high bar is never an easy task," Padilla v. Kentucky, 559 U.S. 356, 371[] (2010), and the strong societal interest in finality has "special force with respect to convictions based on guilty pleas." United States v. Timmreck, 441 U.S. 780, 784[] (1979). Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.

Lee, 582 U.S. at 368-69. "Because a petitioner must establish both prongs of the [Strickland] test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370.

The validity of a guilty plea is a mixed question of law and fact that is reviewed de novo. Lane, 316 S.W.3d at 562. To be valid, a guilty plea must be entered into knowingly, voluntarily, and intelligently. Id. (citing State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977); North Carolina v. Alford, 400 U.S. 25, 31 (1970); Brady v. United States, 397 U.S. 742, 747 (1970); Boykin v. Alabama, 395 U.S. 238, 242-44 (1969)). "[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea[.]" Mackey, 553 S.W.2d at 340; see Tenn. R. Crim. P. 11(b)(1). "Courts are constitutionally required to notify defendants of only the direct consequences—not the collateral consequences—of a guilty plea." Ward v. State, 315 S.W.3d 461, 467 (Tenn. 2010). "The most obvious 'direct consequence' of a conviction is the penalty to be imposed. It is, therefore, well-recognized that the defendant must be apprised of the sentence that he will be forced to serve as the result of his guilty plea and conviction." Blankenship v. State, 858 S.W.2d 897, 905 (Tenn. 1993) (internal quotations omitted).

When determining whether a guilty plea was knowingly, voluntarily, and intelligently entered, the court must consider "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Lane, 316 S.W.3d at 562 (quoting Grindstaff, 297 S.W.3d at 218). If a guilty plea is not knowingly, voluntarily, and intelligently entered, then the defendant has been denied due process, and the guilty plea is void. Id. (citations omitted). A plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats. . . ." Blankenship, 858 S.W.2d at 904 (quoting Boykin, 395 U.S. at 242-

- 12 -

43). In determining whether a guilty plea is voluntarily and intelligently entered, a trial court must look at a number of factors, which include the following:

> 1) the defendant's relative intelligence; 2) the defendant's familiarity with criminal proceedings; 3) the competency of counsel and the defendant's opportunity to confer with counsel about alternatives; 4) the advice of counsel and the court about the charges and the penalty to be imposed; and 5) the defendant's reasons for pleading guilty, including the desire to avoid a greater penalty in a jury trial.

Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006) (citing Blankenship, 858 S.W.2d at 904).

Based on the Petitioner's supplemental brief, the sole issue for our review is "whether delivering the Defendant's discovery to him on the day of the trial/plea deal violates Defendant's Sixth Amendment rights where Defendant was harmed." Combined with the issue presented in the petition for post-conviction relief, we interpret the Petitioner to claim that his guilty plea was not knowingly and voluntarily entered based on trial counsel's failure to provide Petitioner with discovery until the day of the guilty pleas. The State initially contends the Petitioner has waived appellate review for failure to provide adequate citation and authority in support of his issues and for failure to provide an adequate record.[1] The State nevertheless argues the Petitioner failed to present clear and convincing evidence to overcome the trial court's finding that his guilty plea was knowing and voluntarily made with the advice of competent counsel and the Petitioner's acknowledgments during the guilty plea colloquy.

While not entirely clear from the Petitioner's brief, the thrust of the Petitioner's argument in support of this issue is that he was "rushed" into pleading guilty and did not review the evidence against him before entering his guilty pleas. The Petitioner does not argue on appeal that had trial counsel met with him more frequently than he did, he would have elected to proceed to trial rather than enter a guilty plea. Nor does the Petitioner identify the discovery information that he purportedly learned the day he entered his guilty pleas or explain how, based on this information, he would have proceeded to trial rather than enter his guilty pleas. Instead, the Petitioner laments generally that he pleaded guilty because he "felt like he had no choice."

---

[1]The State's argument was well-taken, and on May 3, 2024, this court ordered the Petitioner to file a supplemental brief in accordance with Rule 27 of the Tennessee Rules of Appellate Procedure. On June 2, 2024, the Petitioner filed a supplemental brief.

Upon our review, we conclude that the record supports the determination of the post-conviction court. The guilty plea colloquy reflects that the Petitioner understood he could have proceeded to trial or entered the guilty pleas. The Petitioner's primary concern at the guilty plea hearing was the alignment of his sentence, which was explained to him in detail by the court and the State. We acknowledge that the Petitioner expressed concern about the time in which he had to accept the State's offer. However, the record shows the parties entered into plea negotiations on the Petitioner's other cases before the entry of the guilty pleas. The court engaged in a lengthy discussion at the time of the guilty plea hearing to illustrate the extent of the negotiations, and the Petitioner agreed that he wanted to accept the State's offer and enter the guilty pleas. The post-conviction court found that the Petitioner was not rushed into pleading guilty and characterized the deal as a "long-running plea agreement" and that the only "surprise" was that the State changed their mind and allowed the Petitioner to enter a plea agreement they had previously extended to him.

Both counsel and the post-conviction court observed that the Petitioner was "intelligent" and "articulate." Counsel met with the Petitioner at least nine times before he pled guilty and reviewed the discovery material with the Petitioner before entering the guilty pleas. Counsel explained that the discovery consisted primarily of recordings and that the Petitioner, an inmate, may not have had the equipment to listen to the recordings. However, counsel recalled listening to some of the recordings with the Petitioner. The post-conviction court credited counsel's testimony that he met with the Petitioner nine times at the jail and that he reviewed the discovery with the Petitioner before entry of the guilty pleas. Finally, counsel and the court acknowledged that had the Petitioner proceeded to trial and been found guilty, he could have received "the equivalent of a life sentence[.]" The post-conviction court's findings of fact "are conclusive on appeal unless the evidence preponderates against those findings." Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003); Younger v. State, No. E2018-02168-CCA-R3-PC, 2019 WL 7049692, at *4-5 (Tenn. Crim. App. Dec. 19, 2019). Accordingly, we conclude that the Petitioner failed to establish that his guilty pleas were unknowingly and involuntarily entered based on trial counsel's alleged deficient performance. He is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and authority, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 14 -